UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIGITAL GENERATION, INC. f/k/a
DG FASTCHANNEL, INC.,

          Petitioner,               Civil Action No. 12-cv-15271

     v.                       District Judge Julian Abele Cook
                                  Magistrate Judge Laurie J. Michelson

STEVEN A. BORING,

          Respondent.
_____/

**REPORT AND RECOMMENDATION TO
GRANT PETITIONER'S MOTION TO CONFIRM ARBITRAL AWARD [5] AND
DENY RESPONDENT'S MOTION TO STAY CONFIRMATION OF ARBITRAL
AWARD AND PETITION TO VACATE OR MODIFY ARBITRAL AWARD [11]**

Soon after leaving his job with Digital Generation, Inc. ("Digital Generation"), Steven

Boring ("Boring") began working for one of Digital Generation's competitors. Digital Generation

believed that Boring took some of its customers, an employee, and confidential information — all

in violation of his employment agreement with Digital Generation. That agreement required Digital

Generation to pursue these claims in arbitration. Following three days of testimony and extensive

briefing, an arbitrator in Texas concluded that Digital Generation had largely proven its claims and

awarded the company over $3.5 million.

Digital Generation now moves to confirm the arbitrator's award. (Dkt. 5., Pet.'s Mot. to

Confirm.) Boring moves to have it vacated. (Dkt. 11, Resp.'s Mot. to Vacate.)[1] Boring claims

_____

[1]Boring alternatively moves to have the arbitral award modified. (Resp.'s Mot. to Vacate at Pg ID 119.) But none of Boring's arguments are pursuant to 9 U.S.C. § 11. *See NCR Corp. v. Sac-Co., Inc.*, 43 F.3d 1076, 1080 (6th Cir. 1995) ("A court's power to modify an arbitration award is confined to the grounds specified in § 11."); *see also Grain v. Trinity Health, Mercy Health*

primarily that the arbitrator manifestly disregarded Texas law by allowing Digital Generation to recover gross profits instead of net profits. This Court believes that the arbitrator's lost profits calculation does not plainly contradict clearly established Texas precedent. For this reason, and those detailed below, this Court RECOMMENDS that Digital Generation's Motion to Confirm Arbitral Award (Dkt. 5) be GRANTED and Boring's Motion to Stay Confirmation of Arbitral Award and Petition to Vacate or Modify Arbitral Award (Dkt. 11) be DENIED.

## I. BACKGROUND

Digital Generation delivers digital advertising; its customers include production facilities, advertising agencies, advertisers, broadcasters, and networks. (Dkt. 11, Boring's Mot. to Vacate, Ex. A, Jt. Stip. ¶ 4.)[2] Beginning in 2004, Boring was employed as the Regional Sales Manager for Digital Generation's Detroit, Michigan office. (*Id.* ¶ 3.)

In March 2011, Boring executed an "At-Will Employment Agreement" ("Employment Agreement") with Digital Generation. (*Id. ¶* 6; Dkt. 1, Pet. to Confirm, Ex. A, Employment Agreement.) Under the Employment Agreement, Boring agreed, for a period of one year following his employment with Digital Generation, not to solicit Digital Generation customers that he had dealt with during his final two years of employment. (Dkt. 1, Pet. to Confirm, Ex. C Award of Arbitrator at 5.) Boring further agreed not to solicit Digital Generation employees for the year

---

*Services Inc.*, 551 F.3d 374, 380 (6th Cir. 2008) ("*NCR* remains the law of this circuit and prohibits modifying an award based on an alleged 'manifest disregard' of law."). Accordingly, the Court considers Boring's motion as one to vacate the arbitration award.

[2]The Court accepts as true an arbitrator's findings of fact. *Sterling Fluid Sys. (USA), Inc. v. Chauffeurs, Teamsters & Helpers Local Union No. 7*, 144 F. App'x 457, 458 (6th Cir. 2005). In this case, this includes the parties' joint stipulation of facts, which the arbitrator incorporated into her award. (Dkt. 1, Pet. to Confirm, Ex. C, Award of Arbitrator at 5.)

following his termination.  (*Id.*)  The Employment Agreement also provided that it was "in all respects" governed by the laws of the State of Texas and that all disputes arising out of the agreement would be "exclusively settled by final and binding arbitration [in] Dallas, Texas, to be administered by the American Arbitration Association (AAA) pursuant to its national rules then in effect."  (Employment Agreement ¶¶ 9, 14.)

On December 19, 2011, Boring terminated his employment with Digital Generation.  (Jt. Stip. ¶ 3.)  About two weeks later, on January 3, 2012, Boring began working for Extreme Reach — a direct competitor of Digital Generation for advertising delivery products.  (Jt. Stip. ¶ 11, 13.)

On January 30, 2012, Digital Generation, believing, among other things, that Boring diverted some its customers to Extreme Reach, initiated arbitration proceedings against Boring for breach of the Employment Agreement.  (Dkt. 1, Pet. to Confirm, Ex. C, Award of Arbitrator at 2.)

 From August 15 to August 17, 2012, Arbitrator Nancy Thomas, a former Texas judge, held a three-day final arbitration hearing.  (Award of Arbitrator at 3.)  Although Digital Generation had previously been aware of six customers that Boring had diverted to Extreme Reach, Boring admitted at the hearing to diverting four additional Digital Generation customers.  (Pet.'s Resp. to Mot. to Vacate at 5; Award of Arbitrator at 4.)

Omar Choucair, Digital Generation's Chief Financial Officer, testified for Digital Generation on the issue of damages.  He explained that in calculating the profits that Digital Generation lost due to Boring's diversion of its customers, he deducted 15% from the lost revenue based on a *variable* cost rate.  (Award of Arbitrator at 11.)  Choucair said that the 15% revenue reduction accounted for Digital Generation's potential ability to save in long-term expenses because it no longer serviced the diverted customers.  (*Id.* at 11.)  Digital Generation also sought to recover for having to reduce

its rates to retain other customers. (*Id* at 12.) On this theory, Choucair made revenue reductions based on a 1% *variable* cost rate; that rate accounted for Digital Generation's savings on paying sales commissions on the lost revenues. (*See id.* at 11.) Although present during Choucair's testimony, Boring's damages expert did not testify. (*Id.*) Also, in her expert report, Boring's expert did not contest the methodology that Choucair used to calculate lost profits. (Pet.'s Resp. to Mot. to Vacate, Ex. I.))

On November 28, 2012, after post-hearing briefing, additional conferences, and email exchanges, the Arbitrator issued her Award. She found that Boring had breached the Employment Agreement by diverting ten Digital Generation customers to Extreme Reach. (Award of Arbitrator at 9, 15.) The Arbitrator further found that Boring solicited the departure of a Digital Generation employee in further violation of the Employment Agreement. (*Id.* at 16.)

Largely for these breaches, the Arbitrator awarded Digital Generation $3,543,334. (*See* Award of Arbitrator at 15-16, 19.) In particular, to compensate Digital Generation for Boring's diversion of nine customers (Digital Generation did not seek damages for the tenth diverted customer), she awarded Digital Generation three years of lost profits for a total of $2,623,000. (Award of Arbitrator at 12, 16-17, 19.) This amount was based on Digital Generation's damages model, and accordingly, the Arbitrator accepted Choucair's use of a 15% variable cost rate. (*See id.* at 11.) The Arbitrator also awarded Digital Generation $941,591 for reducing rates to retain certain customers. (*Id.* at 12, 17, 19.) This amount was also based on Digital Generation's damages model, and accordingly, the Arbitrator also accepted Choucair's use of a 1% variable cost rate reduction. (*See id.* at 11.) (The Arbitrator additionally awarded $7,000 for Boring's diversion of the Digital Generation employee. (*Id.* at 12, 19.))

4

On November 29, 2012, the day after the Arbitrator issued her award, Digital Generation filed a petition to confirm the award in this judicial district.  (Dkt. 1.)

On January 14, 2013, Boring filed a motion to vacate or modify the award.  (Dkt. 11, Resp.'s Mot. to Vacate.)  Boring primarily argues that the Arbitrator erred in failing to deduct *all* business expenses, as opposed to only 15% or 1% in *variable* costs, when calculating Digital Generation's lost profits.  (Resp.'s Mot. to Vacate at 4-13.)  Boring says that if the Arbitrator had used the method of calculating lost profits that Texas law demands, the award would have been 100 times smaller. (*Id.* at Pg ID 119.)

## II.  STANDARD OF REVIEW

"A court's review of an arbitration award 'is one of the narrowest standards of judicial review in all of American jurisprudence.'"  *Way Bakery v. Truck Drivers Local No. 164*, 363 F.3d 590, 593 (6th Cir. 2004) (quoting *Tennessee Valley Auth. v. Tennessee Valley Trades & Labor Council*, 184 F.3d 510, 515 (6th Cir.1999) (per curiam)); *see also Beacon Journal Pub. Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997) ("Even though arbitrators are not flawless, courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error.").

The Federal Arbitration Act provides four grounds for vacating an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been

5

> prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

"This Court's ability to vacate an arbitration award is almost exclusively limited to these grounds, although it may also vacate an award found to be in manifest disregard of the law." *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008).[3] This judicially-created basis for vacatur, however, is "very narrow." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995). "A mere error in interpretation or application of the law is insufficient." *Id.* (citing *Anaconda Co. v. District Lodge No. 27*, 693 F.2d 35, 37-38 (6th Cir. 1982)). Rather,

> the decision must fly in the face of clearly established legal precedent. When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.

*Jaros*, 70 F.3d at 421. Restated, "to find manifest disregard a court must find two things: the relevant law must be clearly defined and the arbitrator must have consciously chosen not to apply

---

[3]As suggested by Digital Generation (Pet.'s Response to Mot. to Vacate at 12 n.25), there is room to argue that, after the Supreme Court's decision in *Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576 (2008), "manifest disregard" is no longer a basis for vacating an arbitrator's award. *See Ozormoor v. T-Mobile USA, Inc.*, 459 F. App'x 502, 505 (6th Cir. 2012); *cf. Schafer v. Multiband Corp.*, No. 12-13152, 2013 WL 607910, at *7 (E.D. Mich. Feb. 19, 2013) (summarizing post-*Hall* cases and concluding, "[t]he Sixth Circuit, for its part, has concluded (albeit with occasional reluctance) that manifest disregard lives on."). The Court need not, and does not, recommend a categorical ruling, however. Even if the basis remains valid, it does not warrant vacatur in this particular case. *See Ozormoor*, 459 F. App'x 505 ("Either way, it makes no difference to Ozormoor's request [to vacate the arbitrator's award].").

6

it." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000).

## III. ANALYSIS

Boring moves this Court to vacate the Arbitrator's award primarily because he believes that the Arbitrator manifestly disregarded Texas law in accepting Digital Generation's lost profits calculation. (Resp.'s Mot. to Vacate at 5; *see also id.* at 4-13.) Additionally, Boring claims that the Arbitrator "displayed evident partiality" (*id.* at 13-16), was "guilty of misconduct for refusing to hear evidence pertinent and material to the controversy" (*id.* at 16-17), awarded punitive damages in contravention of the Employment Agreement (*id.* at 17), engaged in "misbehavior" (*id.*), and exceeded her powers (*id.*). The Court considers these claims in turn. None warrant vacatur.

### A. The Arbitrator Did Not Manifestly Disregard Texas Law

At the heart of Boring's manifest-disregard argument is that, under Texas law, lost profits are always measured as "lost net profit[s], not gross profits." (*See* Resp.'s Mot. to Vacate at 7 (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80 (Tex. 1992)).) And Boring points out that the Texas Court of Appeals has defined net profits as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App. 1988) *writ denied*, 778 S.W.2d 865 (Tex. 1989) (internal quotation marks omitted). Boring asserts that by accepting Digital Generation's damages model, the Arbitrator disregarded the "all" in this statement. (Resp.'s Mot. to Vacate at 5.) Indeed, Choucair testified that he deducted only variable costs:

> Q. So your lost profit model could have been that for every dollar of revenue, you have a 99 percent profit on that?[4]

---

[4]As noted by the Arbitrator, Choucair explained that he used a 15% rather than a 1% deduction to make his lost profits measure more conservative: "Mr. Choucair also testified that DG's

> [Choucair.] As it relates to the revenue that Mr. Boring took from the company, that's correct.
> Q. But you use a lost profit model of taking net revenue and only deducting variable expenses; is that correct?
> A. That's correct.
> Q. Okay. But no other expenses?
> A. That is correct.

(Dkt. 11, Resp.'s Mot. to Vacate, Ex. B, Arbitration Hr'g Tr. at 731.) According to Boring, Digital Generation's net profit margin is more appropriately around 0.4% or 3.9% — not the 85% or 99% that the Arbitrator used. (*Id.* at 7, 18-19.) Using these much smaller profit margins, Boring says that the Arbitrator's award, assuming liability, should have been around $16,000 or $158,000, respectively. (*Id.* at 19.)

Boring also suggests that the Arbitrator manifestly disregarded the law because, in awarding damages to compensate Digital Generation for the rate reductions that Digital Generation made to avoid losing certain customers, she did not require Digital Generation to establish the amount of its losses "'by competent evidence with reasonable certainty.'" (*See* Resp.'s Mot. to Vacate at 11 (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80 (Tex. 1992)).)

The Court finds that, under either theory, Boring has not shown that the Arbitrator manifestly disregarded Texas law.

### 1. The Arbitrator Did Not Manifestly Disregard Texas Law by Failing to Deduct All of Digital Generation's Expenses From Her Lost Profits Award

Boring's claim that Texas law requires that lost profits be calculated by deducting "all" expenses has support. For example, in *Automotive Digital Systems v. Bass*, Automotive Digital

---

only directly variable costs were commissions, which were approximately 1% of total revenue, but DG nonetheless used a 15% variable cost rate to account for potential future reductions to long-term expenses attendant to the loss of customers to Extreme Reach." (Award of Arbitrator at 11.)

Systems ("ADS") sued a former employee, Morris, for disseminating confidential pricing information after leaving ADS. No. 12-94-00187-CV, 1996 WL 773026, at *2, 4 (Tex. App. Oct. 31, 1996) (released for publication Jan. 17, 1997). ADS's chief financial officer testified that ADS had planned to implement a 7% "across the board" price increase but, due to the information leaked by Morris, it had to forgo that increase. *Id.* at *4. ADS's chief financial officer further testified, however, that the 7% figure referred to a planned increase in "sales," i.e., gross revenue less discounts, allowances, and freight. *Id.* As Boring points out, the Texas Court of Appeals held that ADS's lost profits calculation was erroneous because it failed to deduct additional expenses:

> We hold that ADS did not correctly prove its lost profits damages. Profit is gross revenue less expenses. The "sales" figure used by [ADS] is not analogous to lost profits. [ADS's] "sales" calculation does not allow for deduction of any expenses except discounts and freight. By using the "sales" figure, [ADS] failed to allow for the cost of goods sold, salaries, overhead, and other expenses. Therefore, ADS did not competently prove its lost profits.

*Bass*, 1996 WL 773026, at *4.

Boring's other primary case also indicates that Texas law supports deducting all expenses when calculating lost profits. In *Adkins Adjustment Services, Inc. v. Neal*, Adkins sued a former employee for, among other things, breaching a non-solicitation agreement and misappropriating trade secrets. No. 05-00-01419-CV, 2001 WL 1231685, at *1-2 (Tex. App. Oct. 17, 2001). In affirming the trial court, the Texas Court of Appeals held that Adkins "presented no evidence of lost net profits":

> [In calculating Adkin's lost profits, Dr. Shannon Henry Shipp, Adkin's damages expert,] applied a formula he created that forecasted income and subtracted only the costs that would be incurred in attaining those specific revenues, such as a percentage of the claim that was paid to the adjuster and certain clerical fees. Dr. Shipp admitted his calculations were representative of lost gross

9

> profits, *meaning revenues less variable costs incurred in generating that revenue in question; net profits would have been revenue minus all costs associated in operating the business.* In reaching the lost gross profit figures, Dr. Shipp did not deduct nonallocable expenses, such as rent, officer salaries, general clerical salaries, general insurance payments, or utility charges. A.A.S. presented no evidence of at least one complete calculation of lost net profits.

*Neal*, 2001 WL 1231685, at *1 (emphasis added).

Boring cites other cases as well. (Resp.'s Mot. to Vacate at 8 n.6 (citing cases).) For example, Boring additionally relies on the following from a recent Texas Court of Appeals decision:

> Net profit is defined as the difference between a business's total receipts and all of the expenses incurred in carrying on the business. . . . Gross profit, by contrast, is the difference between a business's receipts and the cost of goods sold, without adjusting for additional expenses and taxes.

*Hoss v. Alardin*, 338 S.W.3d 635, 654 (Tex. App. 2011).

But Boring's authorities are not the end of the story. Texas law recognizes an exception to the general rule that Boring claims is absolute. In *Methodist Hospitals of Dallas v. Corporate Communicators, Inc.*, No. 05-92-01922-CV, 1993 WL 189894 (Tex. App. May 28, 1993), for example, the Texas Court of Appeals did not require the deduction of all expenses. There, Corporate Communicators, Inc. ("CCI") and Methodist entered into a magazine purchase agreement. *Id.* at *1. After part performance, Methodist instructed CCI "not to produce or deliver any more magazines." *Id.* CCI sued, and the jury agreed with CCI that Methodist had breached the parties' agreement. *Id.* Methodist then appealed arguing that the following jury instruction on damages was error: "CCI's costs not affected or reduced by [Methodist's] breach of the magazine contract should not be deducted from the contract price in calculating damages." *Id.* at *4. The Texas Court of Appeals disagreed that the instruction was error. *Id.* It explained that a proper lost profits calculation need

10

not always deduct all expenses:

> The formula for calculating lost profits is the unpaid contract price less the costs attributable to performance. [*Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 725 (Tex. App. 1984)]. Variable costs, or costs incurred as a result of performance of a contract, are not recoverable as an element of lost profits because a party no longer incurs these costs when his performance under the contract is excused after the other party's breach. [*Memorial City Gen. Hosp. Corp. v. Cintas Corp., No. 81*, 679 S.W.2d 133, 137 (Tex. App. 1984); *Copenhaver v. Berryman*, 602 S.W.2d 540, 546 (Tex. Civ. App. 1980); *Houston Chronicle Pub. Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 932 (Tex. Civ. App. 1975).] *However, fixed overhead costs, or costs which a party still incurs even after he no longer has to perform under a contract, are recoverable as part of lost profits damages. Memorial City Gen. Hosp. Corp.*, 679 S.W.2d at 137; *Copenhaver*, 602 S.W.2d at 546; *Houston Chronicle Publishing Co.*, 519 S.W.2d at 932.

> We find no Texas cases holding that fixed overhead costs are not recoverable as an element of lost profits damages.

*Methodist Hospitals*, 1993 WL 189894, at *4 (emphasis added). Elsewhere, in a section entitled "Calculation of Lost Profits," the Appellate Court reiterated:

> The amount of lost profits that is recoverable is *usually* measured by the loss of net profits and not the loss of gross profits. *Memorial City Gen. Hosp. Corp.*, 679 S.W.2d at 137. As we also previously noted, allowance should be made for expenditures that the plaintiff would have been compelled to make if he had to perform the contract and the value of plaintiff's time *but not for expenses that would remain whether or not the plaintiff has to perform the contract*.

*Id.* at *5 (emphases added).

*Methodist Hospitals* does not stand alone. In *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, Springs promised one of its window blind fabricators, Blind Maker, that it would not divulge certain confidential sales information. 184 S.W.3d 840, 850-51, 60 (Tex. App. 2006). Evidence produced at trial, however, showed that Springs "provided this information to rival

11

fabricators to enable them to compete for Blind Maker's customers." *Id.* at 862.  Blind Maker

sought lost profits attributable to Springs' conduct.  *Id* at 887.  In calculating its lost profits, Blind

Maker utilized a "gross margin." *Id.* at 887-88.  The Texas Court of Appeals, noting that the usual

rule was net rather than gross profits, nonetheless concluded that gross profits was the appropriate

measure of damages:

> Ordinarily, the calculation of lost profit damages must be based on
> net income, not gross revenue or gross profits. . . .
>
> However, [Blind Maker's founder] testified that Blind Maker's net
> profits could be determined by subtracting overhead from gross
> margins.  When a defendant's actions cause a reduction in the extent
> of business done by the injured party, *but does not create any
> reasonable opportunity for the injured party to reduce its expenses,
> the defendant is entitled to no reduction in the damages awarded
> against him with respect to overhead costs*. . . .
>
> Here, the jury found that Springs committed fraud, and that fraud left
> Blind Maker with no way to reduce its expenses—Blind Maker's
> operating costs remained basically the same but Springs refused to
> sell Blind Maker more material, to buy back Blind Maker's unsold
> inventory, or to provide Blind Maker with service.  Under these
> circumstances, gross profits are an appropriate measure of lost-profit
> damages.

*Blind Maker*, 184 S.W.3d at 888 (emphases added).

Further still, the Fifth Circuit Court of Appeals has acknowledged an exception to Texas'

general rule:

> Under Texas law, the proper damages award for a breach of contract
> is the amount necessary to put the party in "the same economic
> position in which it would have been had the contract not been
> breached." . . . . *Generally*, the measure of damages meeting this
> standard is net profit.  Specifically, the gross amount the
> non-breaching party would have received if the contract had been
> fulfilled should *normally* be reduced by any unpaid costs the
> non-breaching party would have to incur to complete performance of
> the contract. . . .  The burden is on the plaintiff to provide evidence

12

of any costs avoided to allow the jury to properly calculate net damages. . . . *However*, this *general* rule does not apply in situations where the breach of contract occurs in such a manner that the non-breaching party does not have the opportunity to reduce its expenses. *See Houston Chronicle Publ'g Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 932 (Tex. Civ. App. Houston [1st Dist.] 1975, writ ref'd n.r.e.) (holding that if the defendant's breach does not permit the plaintiff to reduce its overhead then defendant is not entitled to a reduction in the damages awarded against it).

*DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 428-29 (5th Cir. 2003) (emphases added); *see also ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 879 (Tex. 2010) ("Swinnea also contests that overhead costs and other unspecified expenses were not included in ERI's [lost profits] evidence or calculation. However, it is not necessarily the case that a company will incur increased expense or overhead, especially where—as evidence here suggests—a corporation was already profitable at the time damages began, and evidence supports an inference that it could have performed profitable services using only its existing resources.").

Given the foregoing, the Court cannot say that the Arbitrator consciously disregarded clearly established Texas law in calculating lost profits. The Arbitrator found that "[w]ith respect to DG's use of a 15% variable cost rate, Mr. Choucair testified that DG's costs for these accounts were almost entirely fixed because DG pays 'the same amount every month whether we're distributing 5,000 spots, 50,000 spots, or zero spots.'" (Award of Arbitrator at 11; *see also* Dkt. 16, Pet.'s Resp. to Mot. to Vacate, Ex. A Garret Decl., Ex. J. Arbitration Hr'g Tr. at 667-69 (explaining that Digital Generation's fixed costs included computer network equipment for digital distribution of advertisements, personnel costs, and office rent).) Based on this finding of fact, she concluded that Texas law, as set forth in cases like *Houston Chronicle* (relied upon by the Fifth Circuit in *DP Solutions*), *Blind Maker*, and *DP Solutions*, did not require Digital Generation to "deduct expenses

13

that were not and could not be saved as a result of Mr. Boring's breaches." (Award of Arbitrator at 16 n.6 (citing cases).) Given the cases discussed above that apply an exception to Boring's categorical "all expenses" rule, as well as those cases cited by the Arbitrator, the Arbitrator's lost profits calculation does not "fly in the face of clearly established legal precedent," *Jaros*, 70 F.3d at 421.

Boring resists this conclusion by implying that, in relying on cases like *Houston Chronicle, Blind Maker*, and *DP Solutions*, the Arbitrator ignored clear statements by the Texas Supreme Court. (Resp.'s Reply to Pet.'s Response to Mot. to Vacate at 2 n.2.) Boring refers to *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80 (Tex. 1992) and *Miga v. Jensen*, 96 S.W.3d 207 (Tex. 2002). Under a permissible reading of these decisions, however, it appears that the Arbitrator did not ignore their clear mandate.

In *Miga*, the Texas Supreme Court stated, "Lost profits are damages for the loss of net income to a business measured by reasonable certainty." 96 S.W.3d at 213. Boring relies on the first part of this statement, i.e., that lost profits are net income. (*See* Resp.'s Mot. to Vacate at 7-8.) But that appears to be dicta. In the very next sentence, the Texas Supreme Court focused only on the second half of the statement: "Here, there was no evidence before the jury that [the plaintiff] suffered reasonably certain business losses resulting from [the defendant's] breach." 96 S.W.3d at 213. In fact, the question presented in *Miga* had nothing to do with whether lost profits should always be calculated as net profits; at issue was whether damages for an employer's breach of an agreement to sell stock to an employee should be measured at the time of breach or at some later time (e.g., at the time of trial when the stock price had dramatically increased). *See id.* at 209, 214-16.

14

*Holt* also does not say what Boring needs it to.  Boring relies on the following from the

Texas Supreme Court's decision:

> The trial court's judgment includes the $120,000 as "Loss of Income
> Due to Absence of Dozer."  Holt Atherton notes that the correct
> measure of damages is *lost net profit, not gross profits.  See Turner
> v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex.App.—Dallas 1988, *writ
> denied per curiam,* 778 S.W.2d 865 (Tex.1989)); *Copenhaver v.
> Berryman*, 602 S.W.2d 540, 544 (Tex. Civ. App.—Corpus Christi
> 1980, writ ref'd n.r.e.).  However, read most favorably to the Heines,
> the record indicates that the trial court's judgment is based on an
> amount the court determined remained after the Heines had paid out
> expenses.  Therefore, the court applied the correct measure of
> damages.  To avoid confusion in this opinion, we refer to the
> $120,000 award as "lost profits."

*Holt Atherton*, 835 S.W.2d at 83 n.1 (emphasis added); *see also id.* at 84 (explaining that "lost

income is not the correct measure of damages").  Boring implies that the emphasized language

demonstrates that the Texas Supreme Court established a categorical rule that a proper lost profits

calculation always requires deducting all expenses.  (*See* Resp.'s Mot. to Vacate at 7-8; Resp.'s

Reply to Pet.'s Resp. to Mot. to Vacate at 2 n.2, 3.)  Although Boring's reading of *Holt*'s language

is permissible, it is not mandated.  The Texas Supreme Court did equate lost profits with net profits

and not gross profits.  But what it did not state is that this equivalence always holds without

exception.  A rational jurist could understand the Texas Supreme Court to have stated the rule in

general terms or in terms most applicable to the facts before it.  In fact, rational jurists have done

just that.  For example, the Texas Court of Appeals in *Blind Maker* cited both *Holt* (and *Miga*) and

nonetheless applied a gross profits measure for lost profits.  *Blind Maker*, 184 S.W.3d at 884.  Given

that the Texas Court of Appeals was aware of, and even relied on, *Holt* (and *Miga*), and then

published a decision permitting a lost profits calculation based on gross profits, the Court is hard

pressed to find that the Arbitrator's similar conduct was a conscious disregard of Texas law.

15

Boring's alternative argument also fails to persuade.  At oral argument, Boring appeared to argue that even if Texas law permits an exception to the rule that all expenses must be deducted when calculating lost profits, the exception did not apply to the facts before the Arbitrator.  Boring, however, has not shown (1) that the cases relied upon by Digital Generation and the Arbitrator clearly define the outer-bounds of the exception, or, having cleared that hurdle, (2) that the facts of this case clearly fall outside the defined boundary.  In other words, Boring's alternative argument at most establishes that the Arbitrator erred in her interpretation of the breadth of the exception or in her application of the exception to the facts before her.  These types of errors, however, do not justify vacating her award. *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient.").

In sum, Boring essentially claims that his reading of Texas law is preferable to Digital Generation's.  But deciding that issue was for the Arbitrator — not this Court.  This Court's task is very limited: it must decide whether Boring has shown that the Arbitrator consciously chose to ignore a rule clearly established in Texas law.  Upon an independent review of the precedents, this Court concludes that Boring has not carried that heavy burden.

### 2. The Arbitrator Did Not Manifestly Disregard Texas Law in Awarding Rate Reduction Damages

Boring also argues that Digital Generation did not demonstrate its damages for the rate reductions it made to retain certain customers "'by competent evidence with reasonable certainty.'" (Resp.'s Mot. to Vacate at 10-11 (quoting *Holt Atherton*, 835 S.W.2d at 84).)  Boring says that Digital Generation "admittedly provided no evidence that these rates were reduced after Boring allegedly solicited these customers; what the rates were before the rate reduction; and what the rates were after the rate reduction."  (*Id.*)  It follows, says Boring, that "[Digital Generation's] 'rate

reduction' damages calculation was insufficient as a matter of law, law the Arbitrator manifestly disregarded." (*Id.*)

Under Texas law, "[t]he amount of the [profits lost] must be shown by competent evidence with reasonable certainty." *Holt Atherton*, 835 S.W.2d at 84. "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Id.*; *see also Capital Metro. Transp. Auth./Cent. of Tennessee Ry. & Navigation Co., Inc. v. Cent. of Tennessee Ry. & Nav. Co., Inc.*, 114 S.W.3d 573, 579 (Tex. App. 2003) ("The test is a flexible one in order to accommodate the myriad circumstances in which claims for lost profits arise."). At a minimum, "opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton*, 835 S.W.2d at 84; *see also D. G. Bros., Inc. v. Pizza Inn, Inc.*, No. 06-98-00151-CV, 2000 WL 16470, at *6 (Tex. App. Jan. 12, 2000) ("To recover lost profits in a breach of contract case, the plaintiff must adduce evidence from which the jury can reasonably estimate the amount of the loss."). Supporting documentation, however, merely goes to the weight of the evidence: "it is not necessary to produce in court the documents supporting the opinions or estimates." *Holt Atherton*, 835 S.W.2d at 84.

Upon a review of the record before the Arbitrator, this Court cannot conclude that Digital Generation's rate-reduction evidence was so deficient that the Arbitrator's award of rate-reduction damages was tantamount to a conscious disregard of Texas law requiring proof to a reasonable certainty. At the arbitration hearing, three witnesses testified that Digital Generation reduced rates after Boring began soliciting its customers. (Dkt. 18, Pet.'s Supp. Resp. Br. to Mot. to Vacate, Ex. A, Arbitration Hr'g Tr. at 82, 447, 505-06.) Choucair testified to the annual revenue Digital Generation lost because it reduced rates for seven customers. (Arbitration Hr'g Tr. at 675-77.) He

17

also presented a slide showing the exact loss for each rate-reduction customer.  (Pet.'s Supp. Resp. Br. to Mot. to Vacate, Ex. A.)  As explained to this Court at oral argument, Digital Generation also provided the Arbitrator with a chart showing, for some customers at least, the reduced-rate amounts. (*See also* Dkt. 20.)  On the other hand, it appears that Boring did not produce contrary evidence specific to Digital Generation's rate-reduction claim.  And it appears that Boring did not cross-examine any Digital Generation witness on their rate-reduction testimony.  (Pet.'s Supp. Resp. Br. to Mot. to Vacate at 1.)  Given the rather one-sided record before the Arbitrator on the issue of rate-reduction damages, the Arbitrator reasonably concluded that Digital Generation had proven its rate-reduction damages to a "reasonable certainty."   At a minimum, Boring has not shown that the evidence before the Arbitrator was so incomplete that the Arbitrator's rate-reduction award was a manifest disregard of the reasonable certainty standard.

### B.  Boring Has Not Shown That The Arbitrator Was Partial to Digital Generation

Boring claims that the Arbitrator evidenced her partiality for Digital Generation by (1) refusing to apply Texas law on lost profit damages, (2) "coach[ing]" Digital Generation to submit evidence on damages through a "sur-sur-rebuttal brief that was not part of the Arbitrator's briefing order" and then refusing to give Boring adequate opportunity to submit evidence or arguments in response, (3) *sua sponte* inviting Digital Generation to assert a claim for post-award interest, and (4) violating American Arbitration Association rules.  (Resp.'s Mot. to Vacate at 13-16.)

The Federal Arbitration Act provides that a court may vacate an arbitration award "where there was evident partiality or corruption in the arbitrators."  9 U.S.C. § 10(a)(2).  Under this provision, "the challenging party must show that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration."  *Uhl v. Komatsu Forklift Co., Ltd.*, 512

F.3d 294, 306 (6th Cir. 2008) (internal quotation marks omitted).  It is therefore not enough for the party seeking to vacate the award to demonstrate the appearance of bias.  *Id.*  Rather, "the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator."  *Uhl*, 512 F.3d at 306 (quoting *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 329 (6th Cir. 1998)).

As an initial matter, a reasonable person would not be compelled to conclude that the Arbitrator was partial to Digital Generation because she decided not to deduct all expenses in calculating lost profits or because she concluded that Digital Generation had adequately proven its rate-reduction damages.  As discussed, the manner in which the Arbitrator calculated lost profits, even if erroneous, has support in Texas precedent.  Further, also as discussed, Digital Generation produced enough evidence for the Arbitrator to reasonably conclude that Digital Generation had proven its rate reduction damages to a reasonable certainty.  Accordingly, the Court does not believe that a reasonable person would find partiality based on the manner that the Arbitrator calculated damages.  *See Urban Associates, Inc. v. Standex Electronics, Inc.*, No. 4:04-CV-40059, 2012 WL 1079723, at *10 (E.D. Mich. Feb. 17, 2012) *report and recommendation adopted*, 2012 WL 1079720 (E.D. Mich. Mar. 30, 2012) ("The fact that the majority arbitrators ruled against plaintiff, even repeatedly, does not establish that they did so for improper motives and thus provides no evidence of evident partiality."); *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000) ("Dawahare first argues that the award should be vacated under 9 U.S.C. § 10(a) because the discrepancy between the damages awarded and the damages alleged shows evident partiality.  We see no basis to sustain this argument. . . .  Because Dawahare points to nothing but the amount of the award to establish evident partiality, there is no basis to vacate the award on this ground.").

The Arbitrator's allowance of a "sur-sur-rebuttal" brief, without giving Boring the opportunity to file yet another response brief, also does not evidence partiality.  The following procedural history makes this clear.

After the arbitration hearing, the parties and the Arbitrator discussed, via email, how to account for the four diverted customers that Digital Generation first learned about at the hearing.  (*See* Resp.'s Mot. to Vacate, Ex. C Lyons Decl., Ex. 13.)  Digital Generation, explaining that it would apply the same damages model to these customers as it used for the other six, proposed to prove its additional damages through briefing.  (Lyons Decl., Ex. 13 at 6.)  Digital Generation further proposed that Boring would have the opportunity to respond via briefing and then Digital Generation would submit a reply brief.  (*Id.*)  Boring objected to Digital Generation's proposal on the grounds of having "no opportunity to cross examine DG's witness/declarant regarding his/her damages analysis." (Lyons Decl., Ex. 13 at 4.)  Boring additionally asserted that Digital Generation should not be allowed to file the last brief.  (Lyons Decl., Ex. 13 at 1.)

On September 1, 2012, the Arbitrator issued a post-hearing briefing schedule.  (Resp.'s Mot. to Vacate, Ex. C Lyons Decl., Ex. 14.)  It provided that Digital Generation would file an opening post-hearing brief and granted Digital Generation leave to submit damages evidence relating to the diverted customers it first learned about at the hearing.  (*Id.*)  It further directed Boring to file a response where he could object to Digital Generation's evidence and include his own evidence.  (*Id.*)  The order also directed Digital Generation to file a reply brief and Boring to file a sur-reply brief.  (*Id.*)

After the parties submitted their briefs, on November 2, 2012, the Arbitrator informed the parties that, "pursuant to Rule 34 of the AAA Employment Arbitration Rules," she was reopening

the hearing "for the purpose of directing a Surrebuttal from DG in response to [Boring's] Sur-Reply." (Resp.'s Mot. to Vacate, Ex. C Lyons Decl., Ex. 18 at 5.) Then, a few days later, the Arbitrator decided that it would be "more efficient and cost effective to have a telephonic hearing to discuss some of the issues raised in the post-hearing briefs in lieu of an additional written response from DG at this time." (*Id.* at 4.) Boring says that the following occurred at the telephone hearing:

> Arbitrator Thomas asked questions primarily related to DG's damages claim and why DG did not address the [Texas Supreme Court's decision in] *Miga* . . . . Arbitrator Thomas also asked Mr. Boring to explain its statement that DG had failed to support its lost profits damages model with any evidence of a history of profitability, which evidence could be used to support an award of lost profits. . . . Mr. Boring's counsel again explained to the arbitrator that *Mr. Boring*, not DG, had submitted evidence of DG's profitability when he entered into evidence DG's Second Quarter 2012 10-Q Report . . . and DG's 2011 10-K report[;] . . . DG presented no evidence of any history of profitability. Moreover, Mr. Boring's counsel explained that this publicly-available information demonstrated that DG's 'history of profitability' showed that DG's profits were *less than 1%* in Q2 2012 and were incredibly below the 85% and 99% profit margins that DG requested in its damages model. The arbitrator ignored the comments of Mr. Boring's counsel . . . .

(Lyons Decl. ¶ 25.)

After the hearing, the Arbitrator ordered Digital Generation to file a 15-page brief — the "sur-sur-rebuttal" brief that Boring now complains of. (*Id.* at ¶ 26, Ex. 17.) She also ordered, however, that Boring advise her on "whether an additional telephonic hearing and/or supplementation of additional authorities is requested." (Lyons Decl., Ex. 17.) Boring then sought to respond to Digital Generation's brief (already a sur-sur-reply) with a "7 to 10 page brief." (Lyons Decl., Ex. 18 at 2.) When Digital Generation objected, the Arbitrator permitted Boring's counsel "to make any final points at a brief conference call." (*Id.* at 3.) Boring says that, at the November

21

11, 2012 conference call, the Arbitrator stated that Digital Generation's 15% cost-rate reduction was "generous" and that Digital Generation "did not even have to account for that much—all it had to account for was the 1% for sales commissions." (Lyons Decl. ¶ 30.)  The call lasted about 40 to 50 minutes.  (*Id.*)

The foregoing is not sufficient to evidence partiality.  Upon receiving the post-hearing briefing, the Arbitrator believed that the parties could further aid her understanding of how lost profits should be calculated under Texas law.  She therefore held a telephone hearing.  At the hearing, she asked Digital Generation why it had not addressed a Texas Supreme Court decision and asked Boring to expand on his claim that Digital Generation had not shown a history of profitability. These inquiries do not evidence partiality.  Then, still having questions after the hearing, she directed Digital Generation to file a "sur-sur-rebuttal" brief.  Far from "muzzl[ing] Boring" (Resp.'s Mot. to Vacate at 16), however, she permitted Boring to respond to what was then already five rounds of briefing during a 40 to 50 minute telephone conference.  Although Boring views the above chronology differently, it permits a narrative of thorough, neutral decision-making.

Boring also claims that the Arbitrator evidenced her partiality to Digital Generation by *sua sponte* raising post-award interest.  In support, Boring presents a lengthy procedural history showing that, at numerous stages of the arbitration proceedings, Digital Generation failed to explicitly request post-award interest.  (Resp.'s Mot. to Vacate at 13-15.)  He then asserts that the Arbitrator, "of her own volition," encouraged Digital Generation to seek post-award interest.  (*Id.* at 15.)

Boring de-emphasizes relevant procedural history.  On November 15, 2012, the Arbitrator sent an email to counsel inquiring: "Counsel, is [Digital Generation] seeking post-award interest in this case?"  Then, following Boring's counsel's email objection "to an award providing for any form

22

of relief not a part of DG's live pleadings/demand" (Resp.'s Mot. to Vacate, Ex. C Lyons Decl., Ex.

20 at 4), the Arbitrator explained why she had raised the post-award interest issue:

> I made the inquiry because I, too, noted that there is no mention of
> post-award interest in DG's Amended Demand or in its proposed
> Award; however, the Amended Demand prays for "such other and
> further relief as this Court may deem just and proper." I request both
> parties to address whether this is sufficient to support post-award
> interest. Thank you.

(*Id.*) The parties then sent the Arbitrator a number of follow-up emails. (*Id.* at 1-4.) Digital

Generation cited a case awarding post-judgment interest and asserted that it was "consistent" with

its demand for other relief as "just and proper." (*Id.* at 3-4.) Boring cited a case and asserted it

evidenced that an arbitrator did not have authority to award post-award interest. (*Id.* at 3.)

The Court believes that the record permits the following interpretation: the Arbitrator merely

sought clarification of an ambiguous statement — "other and further relief" — in Digital

Generation's Amended Demand. The Arbitrator said as much in her email. Consistent with her

statement, she then allowed the parties to argue the issue. A reasonable person could conclude that

the Arbitrator did not act in evident favor of Digital Generation by seeking clarification on the issue

of post-award interest.

Lastly, Boring claims that the Arbitrator violated a number of American Arbitration

Association ("AAA") rules and appears to suggest that, in doing so, she further evidenced her

partiality to Digital Generation. (Resp.'s Mot. to Vacate at 15-16.) Boring first relies on AAA

Rules 5 and 8 to assert that the Arbitrator impermissibly allowed Digital Generation to amend its

claim to include post-award interest. (*Id.*) But, according to the Arbitrator, she was not permitting

amendment; she was simply construing Digital Generation's existing request for "such other and

further relief" to include a request for post-award interest. Boring next cites AAA Rule 33 to assert

23

that the arbitration hearing "shall" be declared closed after briefing, and yet, the Arbitrator reopened the hearing post-briefing to allow Digital Generation to submit the "sur-sur-rebuttal" brief. (*Id.* at 16.) But, when she reopened the hearing, the Arbitrator relied on AAA Rule 34. (Resp.'s Mot. to Vacate, Ex. C Lyons Decl., Ex. 18 at 5.) And that reliance was proper: "The hearing may be reopened by the arbitrator upon the arbitrator's initiative, or upon application of a party for good cause shown, at any time before the award is made." Finally, Boring asserts that the Arbitrator violated AAA Rule 30's requirement that "[a]ll parties shall be afforded an opportunity to examine such documents or other evidence and to lodge appropriate objections, if any." But the Arbitrator gave Boring such an opportunity. For one, Boring engaged in cross-examination of Choucair at the hearing. Second, after Digital Generation submitted additional evidence on damages via brief, the Arbitrator allowed Boring to object and submit his own evidence via brief. She also gave Boring the opportunity to make additional arguments during post-briefing telephone conferences.

In sum, whether combined or considered in isolation, Boring's claims of partiality are not supported by the record. Indeed, they do not even demonstrate an appearance of bias. But even assuming otherwise, under 9 U.S.C. § 10(a)(2) an appearance of partiality is not enough. *Uhl*, 512 F.3d at 306. Instead, "the challenging party must show that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." *Id.* For the reasons stated, the Court believes that Boring has not carried this burden.

### C. Boring's Other Claims Do Not Justify Vacating the Arbitrator's Award

Boring's remaining claims for vacating the Arbitrator's award largely recast arguments rejected above.

Boring asserts that, contrary to the Employment Agreement's proscription on punitive

24

damages, "the Arbitrator rendered an Award grossly in excess of the amount that might be permitted even assuming Boring's full liability," and, in "all but name," awarded punitive damages.  (Resp.'s Mot. to Vacate at 17.)  But the Arbitrator's award directly follows from her belief that Texas law permits deducting less than all expenses when the non-breaching party is unable to reduce its expenses following breach.  Even assuming that her interpretation was error, for reasons already discussed, that error does not demonstrate that the Arbitrator was partial to Digital Generation or that she intended to punish Boring in contravention of the Employment Agreement.

Relying on 9 U.S.C. § 10(a)(3), Boring next claims that the Arbitrator's interactions with the parties and the award itself show that she engaged in misbehavior that clearly prejudiced his rights.  (Resp.'s Mot. to Vacate at 17.)  As already discussed, however, the Arbitrator arguably correctly calculated Digital Generation's damages, arguably properly construed Digital Generation's request for "other and further relief" as a request for post-award interest, and allowed Boring to object to Digital Generation's post-hearing damages evidence, submit his own evidence, and argue the issue via telephone hearings.  On this record, the Court cannot conclude that Boring has carried his "heavy burden" in demonstrating that the Arbitrator engaged in misbehavior.  *See New York Newspaper Printing Pressman's Union No. 2 v. New York Times Co.*, No. 91 CIV. 4677, 1992 WL 122788, at *6 (S.D.N.Y. May 22, 1992) (explaining that "[a] party disappointed by an arbitration award bears a heavy burden in seeking to vacate the award on the ground of an arbitrator's misconduct or misbehavior," and providing that misconduct burden was "analogous" to that of showing evident partiality); *cf. United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987) (equating "misconduct" with "bad faith" and "affirmative misconduct").

Lastly, Boring asserts — in a single sentence — that "[b]y ignoring the AAA rules, as well

25

as the law and evidence as to damages, the Arbitrator exceeded her powers."  (Resp.'s Mot. to

Vacate at 17.)  As discussed, the Arbitrator did not ignore AAA rules, but instead reasonably applied

them.  Further, also as discussed, the Arbitrator did not ignore Texas law on damages, but instead

interpreted the law differently than Boring.  Boring has also not shown that the Arbitrator ignored

the evidence he submitted on damages (e.g., Digital Generation's 10-Q statements).  Rather, it

appears that Boring's evidence was simply of limited probative value once the Arbitrator determined

that not all expenses should be deducted when calculating lost profits.  Accordingly, Boring has not

demonstrated that the Arbitrator exceeded her powers.  *See Federated Dept. Stores, Inc. v. J.V.B.*

*Indus., Inc.*, 894 F.2d 862, 866 (6th Cir. 1990) ("Given the strong federal policy in favor of

enforcing arbitration agreements, . . . the burden of proving that the arbitrators exceeded their

powers is very great."); *see also id.* ("Arbitrators do not exceed their authority unless they display

a manifest disregard of the law.").

## IV.  RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Digital Generation's Motion

to Confirm Arbitral Award (Dkt. 5) be GRANTED and Boring's Motion to Stay Confirmation of

Arbitral Award and Petition to Vacate or Modify Arbitral Award (Dkt. 11) be DENIED.

## V.  FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation

within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*,

474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: March 28, 2013


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 28, 2013.

s/Jane Johnson
Deputy Clerk

27